**RICE SYSTEMS, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 01–311C.

United States Court of Federal Claims.

Oct. 29, 2004.

Howell Roger Riggs, Huntsville, Alabama, for the plaintiff.

John H. Williamson, Trial Attorney, David M. Cohen, Director, Commercial Litigation Branch, Peter D. Keisler, Assistant Attorney General, Civil Division, United States Department of Justice, for the defendant. Major Graeme S. Henderson, Air Force Legal Services Agency, of counsel.

## OPINION

HORN, Judge.

The plaintiff in this case, Rice Systems, Inc., alleges that the United States Air Force terminated the contract at issue for the convenience of the government in bad faith. Specifically, plaintiff maintains that its contract was terminated as a result of gender and national origin discrimination. Denying that the contract was terminated in bad faith, the defendant filed a motion for summary judgment, which plaintiff opposes.

## FINDINGS OF FACT

The United States Air Force solicited proposals for a Small Business Innovative Research (SBIR) contract to construct a prototype "Precision Orbital Microaccelerometer" (POM) for the measurement of satellite crosswinds and drag. The desired POM was described as one that is "low-cost, small size and highly reliable" with the ability to "accurately measure drag at the 0.05 micro-g (5 ng) level and cross track winds at the 0.01 micro-g (1 ng) level." The project contemplated two phases. The goal of Phase I was to "[p]rovide conceptual design of a space-qualified instrument," including a "determination of achievable scale factor and bias levels, size, weight and power requirements." In Phase II, a prototype instrument was to be developed.

Frank Marcos, a principal physicist at the Air Force Research Laboratory (AFRL) at Hanscom Air Force Base, Massachusetts, was the primary Air Force employee responsible for administering the POM project.[1] Mr. Marcos served as the Air Force's technical contract manager. Mr. Marcos drafted the solicitation upon which the contract was awarded and was one of the evaluator's of Rice's proposal.

Rice submitted a Phase I proposal on January 2, 1997, and the Air Force awarded the Phase I contract on March 4, 1997. The basic goal of the Phase I contract was to develop a Phase II proposal. As a result of its Phase I work, Rice submitted a Phase II technical proposal on January 16, 1998. In that proposal, Rice stated that within twenty-four months, it would design, fabricate, and test a POM. Rice also made five other representations to the Air Force in its proposal that are relevant to the dispute in this case. The first four concerned the key personnel who would work on the POM project. Rice's fifth representation dealt with the performance specifications it would meet in designing and constructing the POM.

First, Rice identified Dr. Victor Vali as its "Chief Scientist" and "Principal Investigator" for the project. According to the defendant, the Air Force considered the Principal Investigator position as "the single most important" position on the project.[2] No specific requirements for the Principal Investigator position were set forth in the solicitation. The defendant maintains, however, that the Air Force regarded training, education, and depth of experience in the particular subfield at issue in the solicitation as "important qualifications" for the Principal Investigator.

The subsection of Rice's proposal titled, "Rice Systems Inc. Related Experience with Integrated Optic Sensors," stated that:

For over 20 years, Dr. Vali has been recognized as one of the pioneers in the fields of integrated optics and fiber optics. He is the inventor of the fiber optic gyro. He has published about 65 scientific papers, including the first papers on fiber optic interferometric sensors, laser geophysical strain meters, and gamma ray lasers.

The proposal further indicated that Dr. Vali had received a B.S. in physics in Uppsala, Sweden, and a Ph.D. in physics from the University of Colorado. In addition, Dr. Vali held the following positions: Staff Scientist at Boeing Research laboratory, Research Professor at the University of Washington, Senior Research Scientist at the University of Utah, Consultant for Hughes Aircraft Company on various fiber optic sensors, and Principal Investigator on numerous federal government agency contracts. Dr. Vali had published six articles in relevant fields, was the first to develop the principle of gamma ray lasers, built the first fiber interferometer, and developed a long baseline laser interferometer to measure earth displacements. In evaluating Rice's proposal, the Air Force rated the Principal Investigator staff as "excellent." According to Mr. Marcos, Dr. Vali had "dazzling credentials" and the Air Force regarded him as "someone with very, very high credentials in the field needed for success for this program."

Second, Rice identified Bruce Youmans as the Program Manager, another important position on the project. Third, according to its proposal, Rice had negotiated a memorandum of understanding with the Electronic Systems Corp. of GEC–Marconi Hazeltine (GEC–Marconi) to provide engineering support for the project, and to be responsible for laboratory testing. Fourth, Rice indicated it would collaborate with Lucent Technologies/Bell Laboratories (Lucent) on the design

1. Mr. Marcos has a Bachelor of Science degree and a Master's degree in physics from Northeastern University. He has published over forty papers, and has received numerous performance awards. In August, 2000, the Secretary of the Air Force presented Mr. Marcos with the United States Air Force's Harold Brown Award for outstanding achievement in research and development for his research that dramatically reduced satellite drag errors.

2. Indeed, Rice estimated that the Principal Investigator would devote the highest number of hours to the project. Specifically, Rice estimated the number of man hours for each position on the contract as follows: Principal Investigator—1396, Program Manager—620, Senior Scientist—1250, Scientist—1300, and Technician—465.

and fabrication of the integrated optics chips, which were to serve as the base for the POM.

Fifth, Rice's technical proposal outlined a list of "performance specifications" for the POM, which the company claimed it could "practically achieve during the developmental phase of this program." The performance specifications were as follows: Sensitivity: 4 ng, Peak Acceleration: 7g, Bandwidth: DC to 0.05 HZ, Size: 10 cm $\times$ 10 cm $\times$ 10 cm, Weight: 2 kg, and Power: 3 W. According to the independent report issued with regard to this contract, the "key issues in the design of the spacecraft accelerometer are sensitivity, mass and size."

After submitting its proposal, but before a contract was executed, Rice lost both the Principal Investigator and the Program Manager identified in its Phase II proposal. On June 21, 1998, Rice terminated Mr. Youmans, the Project Manager. Less than a week later, Dr. Vali informed Rice that he no longer wished to hold the position of Principal Investigator on the project. According to the defendant, however, prior to signing the contract, Rice did not notify the Air Force of the loss of the Principal Investigator identified in its proposal.

In July, 1998, the Air Force awarded Rice the SBIR Phase II contract, based upon its Phase I proposal, which had identified Dr. Vali as the Principal Investigator and Mr. Youmans as the Program Manager. The cost-plus-fixed-fee contract provided for a two-year performance period. The contract price was $740,652.00. Pursuant to the contract's limitation of funds clause, the contract was incrementally funded in the amount of $375,000.00 for the first year of the contract through June 30, 1999.

According to the parties, the device contemplated by the contract had never been produced or designed; the contract was a "Research and Development" project. Pursuant to Section C of the contract, Rice was to "design, fabricate, test and deliver a low cost, compact, three axis accelerometer to measure drag cross winds on satellites" in accordance with its technical proposal, which was incorporated by reference into the contract. Subsection C of section 5352.215–9005 of the contract provided that:

The detailed technical content of the Contractor's proposal was an important factor in the selection of the Contractor for award of this contract. The documents listed above (the proposal) are now contractually binding. The contractor shall not change or otherwise deviate from the content of these documents without prior written approval from the Contracting Officer.

The contract further indicated that "[i]f it is necessary to change the performance, design, configuration or other items specified in the technical proposal in order to comply with the requirements of the contract clauses, special contract requirements, or statement of work, the contract shall be modified appropriately." Both parties have stipulated that the contract was never modified.

As noted above, when the Phase II contract was awarded to Rice, Dr. Victor Vali was listed as the Principal Investigator. The contract included a special clause specifically addressed to the position of Principal Investigator, which stated: "The Rice Systems, Inc. Principal Investigator for this effort is Dr. Victor Vali. No substitution shall be made without the prior written approval of the Air Force Procuring Contracting Officer (PCO)." According to both parties, Rice understood that in order to change the Principal Investigator on the project, it had to propose a new Principal Investigator and obtain government approval of that candidate.

On August 27, 1998, approximately six weeks after the Phase II contract was signed, Rice and the Air Force held a "kick-off" meeting. Dr. Colleen Fitzpatrick, the President of Rice, and Dr. Dominique Fourguette attended the kick-off meeting on behalf of Rice. Five Air Force Research Laboratory (AFRL) employees, including Mr. Marcos, also were present. Dr. Vali, the Principal Investigator identified by Rice in its proposal, did not attend the meeting.

According to the defendant, the kick-off meeting "was, by any honest account, a complete disaster." The defendant maintains that, at the kick-off meeting, Rice informed the Air Force that it would not comply with

the five representations it had made in its proposal, and based upon which the contract had been awarded.

First, at the meeting, Rice stated that Dr. Vali planned to retire and a new Principal Investigator would have to be found for the project. According to the defendant, Rice indicated at the meeting that Dr. Vali, nevertheless, would remain on the project as a consultant, which the defendant claims did not occur.[3] According to Rice, from the time its proposal was submitted on January 16, 1998 to the kick-off meeting on August 27, 1998, Dr. Fitzpatrick was "effectively acting as Principal Investigator" on the project.

Second, Rice informed the Air Force that Mr. Youmans, the Program Manager listed in its proposal, had left Rice and also would have to be replaced. Third and fourth, Rice admitted that the two sub-contractors originally proposed by Rice, GEC Marconi and Lucent, were no longer on the project, and also would have to be replaced. Defendant claims that prior to the kick-off meeting, Rice sent no correspondence to the Air Force regarding the status of the Principal Investigator, or to inform the Air Force of these changes to key positions identified by Rice in its proposal.[4]

Fifth, according to the defendant, Rice presented a design for the POM that differed from that which was set forth in its proposal, and upon which the contract was awarded. Specifically, Rice's proposed design had the following performance parameter goals: sensitivity–100ng, size—$3 \times (10cm \times 10cm \times 10cm)$ and weight–6kg. This new design was twenty-five times less precise, and three times larger and heavier than the design and performance goals set forth in Rice's proposal. Defendant states that Rice modified the original design due to numerous design problems.

Mr. Marcos testified that his opinion of Rice's ability to complete Phase II of the contract changed dramatically for the worse at the kick-off meeting. He stated: "The kick-off meeting was amazing. The principal investigator didn't show up.... And the specifications in the contract weren't going to be met. And the program manager was no longer the program manager. And the subcontractors were no longer the subcontractors." (omission in original). In addition, Mr. Marcos observed that Dr. Fitzpatrick "indicated no knowledge of any other company's activities in building accelerometers" and "with one chart, Dr. Fitzpatrick showed an interpretation of how the accelerometer would be used that was incorrect and not consistent with our stated SBIR objective." Indeed, Rice acknowledged in a letter to the Air Force after the kick-off meeting that "Mr. Marcos' reaction to Rice Systems disclosure of weight constraints and design deficiencies was understandably one of surprise and disappointment."

Late in this litigation, in a declaration submitted with plaintiff's opposition to defendant's motion for summary judgment, Dr. Fitzpatrick claims that on August 3, 1998, prior to the August 27, 1998 kick-off meeting, Mr. Marcos and Dr. Fitzpatrick participated in a telephone conference in which Mr. Marcos allegedly instructed Dr. Fitzpatrick to

---

**3.** According to the defendant, the Air Force was formally notified that Dr. Vali was no longer serving as the Principal Investigator on September 28, 1998.

**4.** In a declaration submitted with plaintiff's opposition brief, Dr. Colleen Fitzpatrick claims that in a July 1, 1998 telephone conversation with Mr. Marcos, Mr. Marcos indicated that Mr. Youmans had informed him that he was no longer employed at Rice. The record contains a June 26, 1998 facsimile copy from Mr. Youmans to Debbie Knox of the government, in which he states that his position was terminated. He also states the following: "I haven't been able to reach Frank Marcos at Hanscom AFB to inform him of this recent matter. It is imperative that he be aware of this .... Could you please pass this information on to Frank Marcos." Aside from Dr. Fitzpatrick's declaration, it is not clear from the record whether Mr. Marcos was informed of Mr. Youmans' departure prior to the kick-off meeting on August 27, 1998.

In her declaration, Dr. Fitzpatrick further states that, after her July 1, 1998 telephone conversation with Mr. Marcos, Mr. Marcos knew that Lucent was no longer a subcontractor on the project at issue. She states: "I don't recall specifically if Mr. Marcos told me that Lucent would no longer be one of the subcontractors to Rice, or I told him that information, but after this telephone conversation, he knew Lucent was not on the team."

change the design specifications.[5] Specifically, according to Dr. Fitzpatrick, Mr. Marcos allegedly informed Rice that the sensitivity of the POM should be 100 nano-gs, not 4 nano-gs, as was required by the contract. Mr. Marcos disputes Dr. Fitzpatrick's assertions, claiming that he did not tell her in a telephone conversation that the sensitivity of the device should be 100 nano-gs. Moreover, no contract modification was ever proposed or approved that altered the sensitivity requirements of the original contract. According to Dr. Fitzpatrick's declaration, however, between this alleged conversation and the kick-off meeting, Rice attempted to complete a design that incorporated Mr. Marcos' allegedly new performance goal for sensitivity: 100 ng.

Based on Dr. Fitzpatrick's belated declaration, plaintiff claims that, at the kick-off meeting, Rice was "met by a completely different Frank Marcos," who plaintiff describes as "antagonistic" and "venomous." Plaintiff contends that Dr. Marcos' intention in switching the performance goals was to "embarrass" her and "call into question her technical and managerial abilities." Specifically, in her declaration, Dr. Fitzpatrick alleges that Mr. Marcos expressed shock that a performance goal of 100 ng was to be used in the design of the accelerometer, and denied that he had directed the change. According to Dr. Fitzpatrick, Mr. Marcos implied that plaintiff had unilaterally chosen to relax the requirements. Although she indicated that Mr. Marcos had directed the change, according to Dr. Fitzpatrick, this created a negative impression of both herself and her team, which embarrassed her. Furthermore, Dr. Fitzpatrick stated that she was placed in this situation in front of her employees, Hanscom Air Force Base and Aero Astro team members. According to plaintiff, it had been put on the defensive by the actions of Mr. Marcos and began to change its design.

On September 14, 1988, after the kick-off meeting, Mr. Marcos sent Dr. Fitzpatrick an e-mail in which he underscored the government's desire that the original specifications in the contract be maintained. He stated that:

> The goals of this effort, consistent with your original proposal were to develop a flight prototype sensor that significantly reduced the size, weight and cost of current satellite drag accelerometer systems while maintaining sensitivity. The major AFRL concerns are based on the significant deviations between the material presented at this meeting and that contained in your proposal.

Mr. Marcos then specifically discussed the issues of sensitivity and weight, stating:

> 1. The sensitivity of the experiment was originally proposed to be 4nano-g. The goal was given as what could be practically achieved during the development phase. At the Kick-off meeting the sensitivity was reduced to only 100 nano-g. We believe that the sensitivity goal of 4nano-g should be maintained, although a threshold of 10 nano-g may be acceptable.
>
> 2. The weight of the instrument was originally proposed as as [sic] 2 kg. At the Kick-off meeting the weight was given as 6 kg. This factor of 3increase [sic] results in an instrument heavier than that currently flown.

With regard to the position of Principal Investigator, Mr. Marcos stated: "The Principal Investigator did not attend the meeting. We were told he plans to retire and will be replaced. We believe that a new Principal Investigator should possess qualifications similar to those initially proposed and contractually agreed upon."

After the kick-off meeting, defendant claims Rice repeatedly failed to find a suitable Principal Investigator to replace Dr. Vali and repeatedly failed to meet the per-

---

**5.** In her deposition, Dr. Fitzpatrick mentioned the direction to change the design specifications, but did not indicate in the deposition that Mr. Marcos' alleged instruction stemmed from gender discrimination. Moreover, as discussed in greater detail below, the deposition does not contain the other specific allegations of gender discrimination delineated in Dr. Fitzpatrick's declaration, which was submitted later with plaintiff's opposition to defendant's summary judgment motion. Plaintiff also alleges that during the telephone conference, Mr. Marcos was informed that Roland Levy at Aero Astro would replace Lucent as one of Rice's subcontractors.

formance specifications of the contract. On September 28, 1998, Rice proposed Dr. Fitzpatrick as Dr. Vali's replacement for the position of Principal Investigator on the project, and submitted Dr. Fitzpatrick's resume to the Air Force. In addition, Rice formally requested that the Program Manager and both subcontractors be replaced. According to the defendant, in effect, Rice proposed that Dr. Fitzpatrick would replace both Dr. Vali and Mr. Youmans, and assume the positions of both Principal Investigator and Program Manager.

The defendant assessed Dr. Fitzpatrick's credentials to be inferior to those of Dr. Vali. Dr. Fitzpatrick founded Rice Systems in 1989, and has been its President ever since. Dr. Fitzpatrick has a Bachelor of Arts and a Master of Science degree in Physics and a Ph.D. in Nuclear Physics. Dr. Fitzpatrick listed experience as a Principal Investigator on one project, a NASA LITE laser program on the space shuttle from 1987 to 1989. Dr. Fitzpatrick reported two awards on her resume, one from the "American Academy of Achievement," in 1991, and "Employee of the Month" at Spectron Development Laboratories, Inc., in 1988. Dr. Fitzpatrick's resume did not list any publications in scientific journals. According to the defendant:

> Dr. Fitzpatrick was not known as a "pioneer in fiber optics," she did not have sixty-five scientific publications, she had no inventions or patents, and she was not an adjunct Professor at a university—unlike the original Principal Investigator named in the contract, Dr. Vali. Nor did she have the outstanding track record, and training, education, and depth of experience in the particular subfield that Dr. Vali possessed.

While the Air Force permitted Dr. Fitzpatrick to serve as Program Manger, it did not consider Dr. Fitzpatrick to be a suitable replacement for Dr. Vali as the Principal investigator.[6] The Air Force stated: "we believe that Rice Systems should provide technical expertise consistent with the original Principal Investigator's qualifications to

maximize the chance of obtaining a successful result."

On November 19, 1998, Rice proposed Dr. Dominique Fourguette, who had received a Ph.D. in Mechanical Engineering from Yale University, as Principal Investigator. In its proposal, Rice described Dr. Fourguette as "well known in the scientific community as being one of the most innovative technologists in the field of optical diagnostics, optical sensors, and aero optical devices."

The Air Force had the opportunity to evaluate Dr. Fourguette's expertise at the August 27, 1998 kick-off meeting. According to Mr. Marcos, she made a "very credible presentation" at the kick-off meeting, and she demonstrated an "understanding ... of how an instrument would be built." The Air Force compared Dr. Fourguette's qualifications to those of the original Principal Investigator, Dr. Vali. The Air Force noted that, although "Dr. Fourguette is a very competent engineer," she did not have the "extensive accomplishments and publications in the field of inertial sensors" that the original Principal Investigator had demonstrated. The Air Force, nevertheless, permitted Dr. Fourguette to serve as Co–Principal Investigator.

Dr. Fourguette was supported by another Co–Principal Investigator, Dr. Gerald L. Shaw, who was employed as a Senior Research Engineer at SRI International. According to the defendant, the Air Force assisted Rice in securing Dr. Shaw, for which Rice expressed its gratitude in a December 14, 1998 letter, which stated: "Thanks to the support and help from Mr. Frank Marcos, Rice Systems, Inc. has negotiated a formal consultant agreement for the services of Dr. Gerald L. Shaw." On February 5, 1999, the Air Force sent a contract modification to Rice designating Dr. Fourguette and Dr. Shaw as Co–Principal Investigators.

In her belated declaration, submitted with plaintiff's opposition to defendant's summary judgment motion, however, Dr. Fitzpatrick presents a different view of the hiring of Dr. Shaw, claiming that she was forced to hire

---

**6.** The Air Force approved Rice's proposed substitutions for the original subcontractors, GEC-Marconi and Lucent.

him because he was a male and that Mr. Marcos would not approve Dr. Fourguette, a female, unless a male, Dr. Shaw, was assigned as the Co–Principal Investigator. According to the plaintiff, Mr. Marcos, "in essence, said that he would relax his stringent requirements, if a male became Co–Principal Investigator."

On February 22, 1999, the Air Force and Rice held a Preliminary Design Review (PDR), which included Dr. Shaw, Dr. Fitzpatrick and Mr. Marcos. According to plaintiff, Mr. Marcos' demeanor at the PDR was entirely different from that displayed at the kick-off meeting. Based only on Dr. Fitzpatrick's declaration, plaintiff attributes Mr. Marcos' alleged change in demeanor solely to the presence of Dr. Shaw, a male, at the PDR.

At this meeting, Rice presented its Preliminary Design Review, which had the following performance parameter goals: sensitivity 10ng, size 22.8 cm × 24.7 cm × 24.7 cm or 15.7 cm × 24.7 cm and weight—3.3kg. According to Mr. Marcos, at the Preliminary Design Review, the sensitivity of the POM remained a factor of 2.5 off from that stated in the proposal, the size was more than three times larger than that stated in the proposal, and the weight was 65 percent higher than that stated in the proposal. In addition, according to the defendant, at the time of the PDR, a sensitivity analysis had not been submitted to the Air Force; therefore, the Air Force requested more information regarding Rice's proposed new design.

Dr. Fourguette resigned from Rice Systems on or about February 26, 1999. As a result, the February 5, 1999 contract modification sent to Rice by the Air Force, which identified Dr. Fourguette as a Co–Principal Investigator, was never executed by Rice. Mr. Marcos was informed of her resignation on March 1, 1999.

On March 17, 1999, Rice proposed that its employee, Dr. Mohamed Abid, serve as Co–Principal Investigator with Dr. Shaw, in place of the departed Dr. Fourguette. Dr. Abid had just received his Ph.D. a month before, in February, 1999. According to the

defendant, Dr. Abid had no experience designing instruments that use fiber optics, nor experience designing accelerometers or a high-precision measurement system. The Air Force, therefore, rejected Dr. Abid as a substitute Co–Principal Investigator on the project.

In an e-mail to Dr. Fitzpatrick, dated March 17, 1999, Mr. Marcos stated: "The candidate you describe has just received a PhD in Feb 99. While he seems to be a good addition to a team, he does not bring to bear the experience needed to lead this specific breakthrough study." In a March 21, 1999 e-mail to Mr. Marcos, Dr. Fitzpatrick conceded that the Air Force's assertion that Dr. Abid was a "new PhD" was "well taken," and Dr. Abid "would definitely have a learning curve on the optics part of the project." Dr. Fitzpatrick then clarified that Rice's "interest in adding him to our team came from his access to and experience with the testing facilities" that would be important to the program. Additionally, in a letter to the contracting officer, dated March 31, 1999, Rice stated: "Mr. Marcos raised the point that Mohamed was a new PhD and did not have the background in optics that was needed to lead this project. We though[t] that Mr. Marcos had a good point." [7]

In that March 31, 1999 letter and the March 21, 1999 e-mail cited above, Rice Systems re-proposed Dr. Fitzpatrick as the Principal Investigator, despite the fact that the Air Force had already deemed her qualifications not comparable to those of the original Principal Investigator, Dr. Vali. Dr. Fitzpatrick claimed that she was highly qualified for the Principal Investigator position; in her March 21, 1999 e-mail, she stated:

> In past written correspondence, [i]n the early weeks of this program, your major objection to myself being Principal Investigator was that I did not have experience in inertial navigation. That problem has been solved through the addition of Gerry Shaw to the team. Frankly, I am the only one I know whose credentials exceed those

7. In her deposition, Dr. Fitzpatrick also conceded that Dr. Abid did not have a "deep back-

ground" in optical diagnostics, optical sensors or aero-optical devices.

of Dominique [Fourguette] in this situation.

On April 9, 1999, Mr. Marcos e-mailed Claire Marcotte, the Air Force's contract liaison, to inform her that the Air Force still had "not received any information from Rice substantiating their claims for the most recent design change and we have not seen any qualified Principal Investigator forthcoming." He added that "their [Rice's] most recent letter contains many statements that are untrue." Having received no sensitivity analysis from Rice on April 16, 1999, Mr. Marcos submitted a letter to Ms. Marcotte in which he recommended that the Air Force discontinue funding of Rice's contract.[8]

On May 4, 1999, the contracting officer, Iris Durden, issued a letter to Rice, in which she informed the company that due to its "inability to provide a qualified Principal Investigator for this contract, the Contract Manager requested that subject contract be closed out to the amount of funds obligated to date ($375,000, covering the period through 30 June 1999)." The contracting officer further stated that no additional work was required under the contract. The May 4, 1999 letter also stated that a "contract modification will be prepared...." However, a contract modification was never issued. The next day, Dr. Fitzpatrick wrote letters to two United States Senators, complaining about what she described as "gross discrimination." [9]

In a May 10, 1999 internal Air Force memorandum, Mr. Marcos detailed the reasons underlying the Air Force's rejection of Dr. Fitzpatrick as the Principal Investigator on the project at issue. Mr. Marcos stated that "[t]he original Principal Investigator was one of the *pioneers of fiber optics and gyroscopes* (published about sixty-five (65) papers). His qualifications were a strong factor in supporting both the Phase I and Phase II SBIR

efforts." (emphasis in original). Mr. Marcos further stated in his memorandum that:

Dr. Fitzpatrick's specialty in nuclear engineering and her experience with a Space Shuttle experiment are largely irrelevant to this contract. We continued to maintain, as Rice inferred in their Phase I and II proposals, that technical expertise consistent with the ORIGINAL Principal Investigator's qualifications are[sic] needed to maximize the chance of obtaining a successful result.

(emphasis in original).

In addition to Rice's failure to replace Dr. Vali with a suitable candidate, Mr. Marcos stated that the company also had "displayed a lack of candor in their Principal Investigator dealings." In 1998, Mr. Marcos noted that Rice made "false claims about retaining the initial Principal Investigator [Dr. Vali] as a consultant and then about having other consultants support Dr. Fitzpatrick." According to Mr. Marcos, Rice also advertised for a new Principal Investigator, even as Dr. Fitzpatrick continued to maintain that she was the best candidate for the position. Finally, Mr. Marcos stated that Rice failed to provide any technical communications to the Air Force regarding its new design, which "served to further confirm our lack of confidence in her [Dr. Fitzpatrick's] capability to act as Principal Investigator since she lost a key technical person, Dr. Dominique Fourquette, just after the PDR." Mr. Marcos concluded that: "Given our inability to reach a satisfactory conclusion with Rice Systems regarding a new Principal Investigator, we felt it was in the best interest of the government to terminate the effort."

On May 13, 1999, Dr. Fitzpatrick contacted Tom Wells, Chief of Hanscom Air Force Base's Contract Pricing Division, and contended that the decision not to fully fund the contract was discriminatory. In response to Dr. Fitzpatrick's allegations of discrimina-

---

**8.** Rice's Second Quarterly Report, dated April 30, 1999, reported the following performance parameter goals: sensitivity 10ng, size 27 cm × 27cm × 20cm and weight 3.3 kg. These parameters were not consistent with those originally proposed by Rice and incorporated into the contract. In his deposition, Dr. Abid testified that,

by April, 1999, there were still numerous problems with the proposed design.

**9.** Dr. Fitzpatrick testified at her deposition, however, that she had never heard Mr. Marcos make derogatory comments about foreign nationals or women.

tion, the Air Force initiated a review of its decision to deobligate funds on the contract. This review was conducted by two scientists, Dr. Bronislaw K. Dichter and Mr. George Murphy, neither of whom had been assigned to the POM project. In a written report, dated May 20, 1999, the two scientists shared Mr. Marcos' concerns about Rice's failure to meet the performance specifications in the contract. They also found Mr. Marcos' rejection of Dr. Fitzpatrick as the Principal Investigator to be a "reasonable decision." The two scientists concluded that: "[G]iven the evidence of the record, [Dr. Fitzpatrick's] independent technical work has not been in the specific area of this contract."

The independent review also found that Dr. Abid was not qualified to be the Principal Investigator. The scientists stated that Dr. Abid "did not have experience in the *design* of the ultra sensitive devices that the contract called for." (emphasis in original). The scientists also noted that even Rice agreed that Dr. Abid was too inexperienced to serve as the Principal Investigator. In sum, the Air Force's independent investigation did not find evidence of discrimination with regard to the contract at issue.

On May 21, 1999, Dr. Fitzpatrick met with a number of Air Force personnel regarding the Air Force's decision not to fully fund the contract. At the meeting, the Air Force stated that it had terminated the contract for the convenience of the government.

## DISCUSSION

The defendant's motion for summary judgment was filed pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106

S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d 1253, 1257 (Fed.Cir.2001); *Avenal v. United States,* 100 F.3d 933, 936 (Fed.Cir.1996), *reh'g denied* (1997); *Creppel v. United States,* 41 F.3d 627, 630–31 (Fed.Cir.1994). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Curtis v. United States,* 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *reh'g denied,* 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States,* 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Johnson v. United States,* 49 Fed.Cl. 648, 651 (2001), *aff'd,* 317 F.3d 1331 (Fed.Cir.2003); *Becho, Inc. v. United States,* 47 Fed.Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.,* 998 F.2d 979, 982 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hall v. Aqua Queen Mfg., Inc.,* 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no

need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Summary judgment:

saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

*Dehne v. United States,* 23 Cl.Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex, Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds,* 970 F.2d 890 (Fed.Cir.1992); *see also United States Steel Corp. v. Vasco Metals Corp.,* 55 C.C.P.A. 1141, 394 F.2d 1009, 1011 (C.C.P.A.1968).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505; *Eli Lilly & Co. v. Barr Labs., Inc.,* 251 F.3d 955, 971 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1109, 122 S.Ct. 913, 151. L.Ed.2d 879 (2002); *Gen. Elec. Co. v. Nintendo Co.,* 179 F.3d 1350, 1353 (Fed.Cir. 1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587–88, 106 S.Ct. 1348; *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Wanlass v. Fedders Corp.,* 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1998).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Trilogy Communications, Inc. v. Times Fiber Communications, Inc.,* 109 F.3d 739, 741 (Fed.Cir.1997) (quoting *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied and en banc suggestion declined* (1995)); *Lockwood v. Am. Airlines, Inc.,* 107 F.3d 1565, 1569 (Fed.Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Am. Airlines v. United States,* 204 F.3d 1103, 1108 (Fed.Cir.2000); *see also Schoell v. Regal Marine Indus., Inc.,* 247 F.3d 1202, 1207 (Fed.Cir.2001).

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party must go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Plaintiff alleges that the Air Force improperly terminated the contract at issue for the convenience of the government. Plaintiff argues that the decisions by Mr. Marcos that Dr. Colleen Fitzpatrick and Dr. Mohamed Abid of Rice were, individually, unqualified to assume the position of Principal Investigator on the project at issue were made in bad faith. Specifically, plaintiff alleges that Mr. Marcos' rejection of Dr. Fitzpatrick was the result of gender discrimination and his rejection of Dr. Abid stemmed from national origin discrimination. Defendant denies that Mr. Marcos' decisions were the result of bad faith, or discrimination of any kind.

**Termination for the Convenience of the Government**

The contracting officer, Iris Durden, sent Rice a letter on May 4, 1999, stating that "[d]ue to Rice Systems [sic] inability to pro-

vide a qualified Principal Investigator for this contract, the Contract Manager requested that subject contract be closed out to the amount of funds obligated to date...." The letter also instructed Rice to stop work on the project[10] and indicated that a "contract modification will be prepared...." Both parties have stipulated that a contract modification was never prepared.

In its complaint, plaintiff had alleged that the Air Force "improperly terminated for convenience" the contract at issue, in bad faith. However, in its post-argument brief, plaintiff contends that the "Contracting Officer's Letter of May 4, 1999, is neither a termination for convenience or a termination for default. It is, at best, an inartful stop work order."[11] In apparent support, plaintiff cites the deposition testimony of the contracting officer, Ms. Durden, in which she stated that the May 4, 1999 letter was "informational... It was not a termination. It was not a stop work order. It was to tell them that funding no longer would be re-furnished to the contractor."

Defendant, in its supplemental brief filed with the court, maintains that it is undisputed that Rice's contract was terminated for the convenience of the government.[12] According to the defendant:

> The contract was not terminated for default. The Air Force's [sic] decided not to obligate any more funds to the contract. The Air Force wanted what it asked for in the SBIR and what was promised in Rice's proposal. When it became readily apparent that Rice could not deliver that product, the decision was made to not fully fund the contract.

Defendant also claims that:

> Rice was informed on several occasions that the termination for convenience clause was invoked. Rice acknowledged that the Air Force terminated its contract for the convenience of the Government (although Rice disputed whether the termination was made in good faith): Rice asked for a meeting with the Air Force to discuss its termination, Rice stopped work on the project, and Rice wrote letters complaining about its termination.

Alternatively, defendant argues that the contract was constructively terminated for the convenience of the government: "Even if it were not made clear to Rice (as it was) that the contract was terminated for the convenience of the Government, then, at most, the Air Force's actions amounted to a constructive termination for convenience." Under this doctrine, defendant asserts, it is irrelevant that the contracting officer did not expressly invoke the termination for convenience clause in her May 4, 1999 letter to Rice ordering it to stop all work on the contract.

The contract between Rice and the Air Force expressly incorporated Federal Acquisition Regulations (FAR) 52.249–06, which states that the government "may terminate performance of work under this contract," if "[t]he Contracting Officer determines that a termination is in the Government's interest." 48 C.F.R. § 52.249–06(a)(1) (1998). Although the contracting officer's May 4, 1999 letter states that the contract at issue is "closed out" and that "work will stop," it did not

---

**10.** Specifically, the contracting officer's May 4, 1999 letter stated:

2. The Statement of Work has been reviewed. Under Line Item 0001, work will stop at the level of design and any fabrication completed as of this date. No additional design, fabrication, test or delivery activities. Under Line Item 1a, no additional work on thermal considerations is required; under Line Item 1b, no work on compatibility with Space Qualifications is required; under Line Item 1d, no work on calibration is required.

3. The requirement for a final report is deleted. There is no requirement for a brief letter summarizing what was accomplished. Any equipment/materials purchased should be returned to the Government.

**11.** In that same post-argument brief, plaintiff also states that, "[i]n the event that the Court does not find bad faith in the administration of the contract, plaintiff asserts that a conversion to termination for convenience is the appropriate remedy."

**12.** Plaintiff notes that in its response to the plaintiff's proposed findings of fact, the defendant stated: "The contract was not terminated for convenience. The Air Force made the decision not to fully fund the contract and informed Rice that no additional work would be required under the contract. Rice understood that no additional work was required under the K [contract]."

explicitly indicate that the contract was terminated for the convenience of the government. The contracting officer did not cite the termination for convenience clause in her letter; nor did she issue a notice of termination. In addition, although the contracting officer's letter stated that "[a] contract modification will be prepared," no such modification formally terminating the contract was issued. Moreover, the contracting officer testified in her deposition that her May 4, 1999 letter was neither a termination, nor a stop work order.

Defendant claims, however, that "Rice immediately understood this as a termination, and complained to the Air Force and others about the termination." Indeed, the record contains evidence suggesting that Rice knew that its contract was terminated. Significantly, in her deposition testimony, Dr. Fitzpatrick stated that she understood the May 4, 1999 letter to be a termination. Additionally, in a May 26, 1999 letter to Senator Kennedy alleging discrimination by the Air Force, Dr. Fitzpatrick referred to the May 4, 1999 letter as the "termination letter." In the May 26, 1999 letter to Senator Kennedy, Dr. Fitzpatrick stated that, prior to her May 21, 1999 meeting with the Air Force, during which she was told that Rice's contract was terminated for the convenience of the government, she believed the purpose of the meeting was to discuss the "termination" of the contract; she viewed the meeting as her "chance to document that it was a wrongful termination." Furthermore, in the May 26, 1999 letter to Senator Kennedy, Dr. Fitzpatrick claims that the language in the May

4, 1999 "termination letter . . . implies termination for cause." [13]

The Air Force's May 4, 1999 letter was not a model of clarity. After reading the May 4, 1999 letter, a contractor could be confused as to the status of its contract with the government.[14] Nevertheless, the letter did make certain things clear: based on concerns about Principal Investigator qualifications, plaintiff was to cease work on the project. The status of the contract was clarified at the May 21, 1999 meeting that the contract was terminated for the convenience of the government.

■ The United States Court of Appeals for the Federal Circuit has stated: "In the absence of bad faith or clear abuse of discretion, the contracting officer's election to terminate for the government's convenience is conclusive." *T & M Distribs., Inc. v. United States*, 185 F.3d at 1283; *see also Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d at 1581; *Fields v. United States*, 53 Fed.Cl. at 417. Conversely, "[w]hen tainted by bad faith or an abuse of contracting discretion, a termination for convenience causes a contract breach." [15] *Krygoski Constr. Co. v. United States*, 94 F.3d at 1541; *see also Custom Printing Co. v. United States*, 51 Fed.Cl. 729, 734 (2002). "The contractor's burden to prove the Government acted in bad faith, however, is very weighty. Due to this heavy burden of proof, contractors have rarely succeeded in demonstrating the Government's bad faith." *Krygoski Constr. Co. v. United States*, 94 F.3d at 1541 (citations omitted).

The court proceeds from a "strong presumption that government officials exercise

---

13. Dr. Fitzpatrick also sent a letter to Senator Boxer complaining of discrimination.

14. In her May 26, 1999 letter to Sen. Kennedy, Dr. Fitzpatrick stated:

In our [May 21, 1999] meeting, the Air Force stated that Rice Systems was terminated for the convenience of the government. However, the [May 4, 1999] termination letter clearly states that "due to Rice Systems' inability to provide a qualified Principal Investigator for this contract, the Contract Manager requested the subject contract be closed." This implies termination for cause.

Nevertheless, in spite of potential grounds for default based on inadequacies in Principal Investigator qualifications and/or failure to meet Pre-

cision Orbital Microaccelerometer specifications, the Air Force chose not to attempt to terminate the contract for default.

15. "In contrast to common law damages for breach of contract, the [termination for convenience of the government] clause limits the contractor's recovery to costs incurred prior to the termination, a reasonable profit on the work performed, and certain additional costs associated with the termination. Anticipatory profits and consequential damages are not recoverable." *Best Foam Fabricators, Inc. v. United States*, 38 Fed.Cl. at 637–38 (citations omitted); *see also Maxima Corp. v. United States*, 847 F.2d at 1552.

their duties in good faith." *Am–Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed.Cir.2002) (citing *Knotts v. United States*, 128 Ct.Cl. 489, 492, 121 F.Supp. 630 (1954)); *see also T & M Distribs., Inc. v. United States*, 185 F.3d at 1285; *Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d at 1581 ("We assume the government acts in good faith when contracting."); *Spezzaferro v. Fed.Aviation Admin.*, 807 F.2d 169, 173 (Fed.Cir.1986); *Sanders v. United States Postal Service*, 801 F.2d 1328, 1331 (Fed.Cir.1986) (stating that "there is a strong presumption in the law that administrative actions are correct and taken in good faith"); *Torncello v. United States*, 231 Ct.Cl. at 45, 681 F.2d at 770; *Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 198–99, 543 F.2d 1298, 1301–02 (1976), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977); *Librach v. United States*, 147 Ct.Cl. 605, 1959 WL 7633 (1959); *Morganti Nat'l Inc. v. United States*, 49 Fed.Cl. 110, 143 (2001), *aff'd*, 36 Fed. Appx. 452, (Fed.Cir.2002). In 2002, the Federal Circuit stated that "for almost 50 years this court and its predecessor have repeated that we are 'loath to find to the contrary [of good faith], and it takes, and should take, well-nigh irrefragable proof to induce us to do so.' " *Am–Pro Protective Agency, Inc. v. United States*, 281 F.3d at 1239 (quoting *Schaefer v. United States*, 224 Ct.Cl. 541, 633 F.2d 945, 948–49 (1980)) (alteration in original); *see also Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed.Cir.), *reh'g denied* (2004) ("[W]hen a bidder alleges bad faith, 'in order to overcome the presumption of good faith [on behalf of the government], the proof must be almost irrefragable.' ") (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1323 n. 2 (Fed.Cir.2003)) (alteration in original); *Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d at 1581 (reiterating the principle that "[a] contractor can overcome [the presumption that the government acts in good faith] only if it shows through 'well-nigh irrefragable proof' that the government had a specific intent to injure it" (quoting *Torncello v. United States*, 681 F.2d at 770)); *Torncello v. United States*, 231 Ct.Cl. at 45, 681 F.2d at 770 (stating "the government...is assumed always to act in good faith, subject only to an

extremely difficult showing by the plaintiff to the contrary.") (citation omitted); *Kalvar Corp. v. United States*, 211 Ct.Cl. at 193–94, 543 F.2d at 1298; *Librach v. United States*, 147 Ct.Cl. at 612 (stating that "clear evidence to the contrary" is necessary to overcome the presumption in favor of the government).

In *Am–Pro Protective Agency, Inc. v. United States*, the Federal Circuit considered the extent of proof required to demonstrate that the government acted in bad faith and modernized the language of the "well-nigh irrefragable proof" standard, consistent with its "well-established precedent that a high burden must be carried to overcome" the presumption of good faith. *Am–Pro Protective Agency, Inc. v. United States*, 281 F.3d at 1239. The court determined that the "clear and convincing" standard of proof "most appropriately describes the burden of proof applicable to the presumption of the government's good faith." *Id.* "Based on this well-established precedent, it logically follows that showing a government official acted in bad faith is intended to be very difficult, and that something stronger than a 'preponderance of evidence' is necessary to overcome the presumption that he acted in good faith, i.e., properly." *Id.* at 1240; *see also Galen Med. Assocs., Inc. v. United States*, 369 F.3d at 1330 (" 'Almost irrefragable proof' amounts to 'clear and convincing evidence.' " (quoting *Am–Pro Protective Agency, Inc. v. United States*, 281 F.3d at 1239–40)).

The Federal Circuit in *Am–Pro Protective Agency* described the "clear and convincing" standard of proof, as follows:

A requirement of proof by clear and convincing evidence imposes a heavier burden upon a litigant than that imposed by requiring proof by preponderant evidence but a somewhat lighter burden than that imposed by requiring proof beyond a reasonable doubt. "Clear and convincing" evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is "highly probable."

*Am–Pro Protective Agency, Inc. v. United States*, 281 F.3d at 1240 (quoting *Price v. Symsek*, 988 F.2d 1187, 1191 (Fed.Cir.1993)). The Federal Circuit also described the type

of proof necessary to establish that a government official acted in bad faith by "clear and convincing" evidence, or "well-nigh irrefragable proof," as it was previously termed:

> In the cases where the court has considered allegations of bad faith, the necessary "irrefragable proof" has been equated with evidence of some specific intent to injure the plaintiff. Thus, in *Gadsden v. United States,* [111 Ct.Cl. 487, 489–90, 78 F.Supp. 126 (1948)] the court compared bad faith to actions which are "motivated alone by malice." In *Knotts, [v. United States,* 128 Ct.Cl. 489, 492, 121 F.Supp. 630 (1954)], the court found bad faith in a civilian pay suit only in view of a proven "conspiracy ... to get rid of plaintiff." Similarly, the court in *Struck Constr. Co. v. United States,* [96 Ct.Cl. 186, 222, 1942 WL 4411 (1942)] found bad faith when confronted by a course of Governmental conduct which was "designedly oppressive." But in *Librach, [v. United States,* 147 Ct.Cl. 605, 1959 WL 7633 (1959)], the court found no bad faith because the officials involved were not "actuated by animus toward the plaintiff."

*Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d at 1240 (quoting *Kalvar Corp. v. United States,* 211 Ct.Cl. at 192, 543 F.2d at 1302 (citations omitted)); *see also Galen Medical Assocs., Inc. v. United States,* 369 F.3d at 1330 (" 'In the cases where the court has considered allegations of bad faith, the necessary "irrefragable proof" has been equated with evidence of some specific intent to injure the plaintiff.' " (quoting *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d at 770)).

**Gender Discrimination**

■ In its complaint, plaintiff alleges that Mr. Marcos' conclusion that Dr. Fitzpatrick was unqualified to assume the position of Principal Investigator was made in bad faith, "and was with an intent to injure." Specifically, plaintiff claims that Mr. Marcos' deci-

sion was based upon gender discrimination, that is, Dr. Fitzpatrick was not selected for the position of Principal Investigator for the sole reason that she is a female.

Defendant argues that the plaintiff has proffered no evidence, much less evidence that can be described as "clear and convincing," that the Air Force engaged in gender discrimination in terminating the contract at issue for the convenience of the government. Defendant characterizes plaintiff's evidence as uncorroborated speculation on the part of Dr. Fitzpatrick, which falls far short of the plaintiff's high burden of producing clear and convincing evidence. Defendant alleges that plaintiff is attempting to manufacture artificially a genuine issue of material fact by submitting a declaration by Dr. Fitzpatrick, well after the filing of the complaint in this case, containing speculative accusations that defendant claims contradicts her deposition testimony and plaintiff's prior admissions.

Allegations of gender and national origin discrimination can qualify as bad faith on the part of the government, if proven.[16] As defendant underscores, prior to submitting the opposition to defendant's summary judgment motion, and the declaration attached thereto, however, it appears that the only suggestion of gender discrimination in the record before this court were the following allegations made by Dr. Fitzpatrick during her deposition testimony:

> Q. Did he [Mr. Marcos] give you—did he do anything—anything, over the course of your dealings with him, that made you think that he had issues with women?
>
> A. Yeah.
>
> Q. What?
>
> A. He terminated my contract.
>
> Q. Other than terminating your contract?
>
> A. No. Not directly, no.
>
> Q. Indirectly?

---

**16.** There does not appear to be clear precedent in this Circuit that equates gender or national origin discrimination with bad faith in the context of a termination for convenience. Racial discrimination, however, has been equated with bad faith, in the context of a termination for default in the Court of Federal Claims. *See At-*

*lanta Appraisal Servs., Inc. v. United States,* 54 Fed.Cl. 51, 55 (2002) ("This court is not precluding plaintiff from raising discrimination as a defense to the default termination, insofar as plaintiff may be able to point to racial discrimination in support of any claim it may have of bad faith conduct by the government.").

A. No. I can only tell you, I never felt comfortable around him.

In her deposition, Dr. Fitzpatrick also was asked to identify any evidence that Mr. Marcos' decision rejecting her as a replacement for the original Principal Investigator was motivated by gender discrimination:

Q. So as a result, you presumed that his motive for not choosing you is personal somehow?

A. Right. I cannot think of anything else.

Q. Why do you think it's sex?

A. Because as far as I can see, Frank [Marcos] and I probably were both Caucasian. We're both American, born here....It can't be that it's a race issue.... [W]hatever church he's in is probably similar to mine, even if it's a different religion.... The only difference between Frank and I, besides—in terms of the category you are talking about, discrimination, is that we are opposite genders.

As evidenced by these excerpts, Dr. Fitzpatrick's deposition testimony, in which she is asked to identify specific evidence of the alleged gender discrimination, is nothing more than uncorroborated speculation that not only fails to meet the high burden of "clear and convincing evidence," but would fail under a lesser standard as well.

Subsequent to the filing of defendant's August 26, 2003 summary judgment motion, on September 22, 2003, plaintiff filed an opposition brief, accompanied by an appendix, which contained a new declaration by Dr. Fitzpatrick, dated September 13, 2003. In its opposition, plaintiff cites Dr. Fitzpatrick's new declaration, claiming that it "makes ... clear that Frank Marcos acted in a manner which was discriminatory." Dr. Fitzpatrick's declaration alleges two instances of gender discrimination on the part of Mr. Marcos.

Plaintiff claims the "first instance is in the contrast between the treatment of the female PhDs at the Kick-off Meeting on August 27, 1998, and the treatment of the two female employees after Rice employed Frank Marcos' former colleague, a male, Gerald Shaw." In her declaration, Dr. Fitzpatrick alleges that, before the kick-off Meeting, a telephone conference occurred on August 3, 1998 between plaintiff and Mr. Marcos. In that telephone conference, plaintiff alleges that Mr. Marcos changed the sensitivity requirement of the device. The contract, which incorporated Rice's proposal, contemplated a POM microaccelerometer with a sensitivity of 4 ng. In her declaration, Dr. Fitzpatrick claims that in the telephone conference, Mr. Marcos "stated a new performance goal of 100 ng." She further testified in her declaration that: "Between August 3, 1998, and August 27, 1998, Rice endeavored to complete a design which incorporated Marcos' new performance goal for sensitivity of 100ng."

At the kick-off meeting on August 27, 1998, Rice presented a design with a sensitivity of 100 ng. According to Dr. Fitzpatrick's declaration, at the kick-off meeting, in front of his colleagues, Mr. Marcos denied any knowledge of the change in the design that he allegedly ordered, for the purpose of discrediting and embarrassing her. Describing Mr. Marcos' conduct at the kick-off meeting as "antagonistic," "venomous," "rude, abrasive, and highly unprofessional," plaintiff claims that Rice was "met by a completely different Frank Marcos," who "was intent on maligning her professional reputation and managerial ability." Dr. Fitzpatrick states the following in her declaration:

From the beginning of the meeting, Mr. Marcos put me on the defensive with his unprofessional demeanor.... When Rice started its technical presentation, however, Mr. Marcos expressed shock that Rice had used the performance goal of 100 ng in the design of the accelerometer, and implied that Rice Systems had unilaterally chosen to relax the requirements on their own to mask the lack of sensitivity of their device. When I pointed out that it was Mr. Marcos who changed the performance goal, he denied it, leaving the audience with a negative impression of both myself and my team.... I was embarrassed and hurt by Mr. Marcos' reaction and negative inference about my professional honesty and ability to lead my team. I was put in this professionally embarrassing position by Mr. Marcos in front of both Hanscom personnel, Aero Astro team members, as well

as my own employees. Frank Marcos showed no empathy in demeaning the work of myself and of Dr. Fourguette, consistent with my experiences of discrimination. In hindsight, I believe that Mr. Marcos' intention in switching the performance goals from 10 ng to 100 ng and then back to 10 ng was to embarrass me in front of my colleagues and to publicly call into question my technical and managerial abilities.

Plaintiff claims that this treatment at the kick-off meeting is contrasted with the treatment of the two females, Dr. Fitzpatrick and Dr. Fourguette, at the Preliminary Design Review on February 22, 1999. According to plaintiff, the Preliminary Design Review was "a short, pleasant meeting in which no serious issues were raised even though significant design changes were being proposed by Rice." Plaintiff underscores that the "only significant change at the [Preliminary Design Review] was the presence of Marcos' male former colleague." Plaintiff, therefore, attributes the alleged difference in Mr. Marcos' behavior solely to the fact that, at the insistence of Mr. Marcos, Rice had employed Dr. Gerald Shaw, a male, who was also present at the Preliminary Design Review. In her declaration, Dr. Fitzpatrick states:

The meeting went remarkably smoothly. Mr. Marcos was polite and did not exhibit the unprofessional behavior as witnessed earlier at the kickoff meeting. His demeanor in the presence of Gerald Shaw was completely different. He was technically involved with the meeting, and participated in the technical discussion .... He was respectful toward me. He did not call into suspicion any aspect of the accelerometer design.

Plaintiff claims that the second instance of alleged gender discrimination "is the requirement by Frank Marcos to employ Dr. Shaw in order to keep the contract." After the departure of Dr. Vali as the Principal Investigator on the project, the plaintiff alleges that Mr. Marcos indicated that he would approve Dr. Fourguette, a female, if Rice would hire Dr. Shaw, his former colleague and a male, as the Co-Principal Investigator. According to plaintiff, "Dr. Fitzpatrick was completely convinced that she was forced to

hire Dr. Shaw as Co-Principal Investigator" solely because he was a male. In her declaration, Dr. Fitzpatrick states:

On December 4[,] 1998 Frank Marcos called me concerning his position on the Principal Investigator position. He said he wanted a Principal Investigator with the [sic] substantially the same qualifications as Dr. Vali. He did offer to approve Dr. Fourguette, a woman, if Rice would hire a former colleague of his, Dr. Gerry Shaw, as Co-Principal Investigator. There was no reason for Dr. Shaw to be the Co-Principal Investigator except that I clearly understood that unless I went along the contract would end. Frank Marcos said that Dr. Shaw would only work about 4 hours a week over the next 2 years. He represented to me that Rice needed Shaw's experience to replace the loss of Dr. Vali in the area of inertial navigation. However, Dr. Vali did not have extensive experience in this field. In retrospect this was just another experience with the "good ole boy club." There were many qualified scientists available to provide technical coverage who were minorities or women and I felt that I was forced to hire Dr. Shaw. The fact that he turned out to be helpful and was personally qualified doesn't change the fact that Dr. Shaw did not need to be the Co-Principal Investigator. He could have been a member of the team without being directed to be Co-Principal Investigator.

According to plaintiff, Mr. Marcos, "in essence, said that he would relax his stringent requirements, if a male became Co-Principal Investigator."

Defendant contends that Dr. Fitzpatrick's new declaration was submitted in an attempt to forestall summary judgment and consists merely of uncorroborated accusations by her. Defendant alleges that these accusations of alleged discrimination were not made clear by Dr. Fitzpatrick in her deposition, her letters to the Air Force or to various members of Congress, or "in any document created in the five years between when the alleged acts occurred and when Rice filed its opposition" to defendant's summary judgment motion. Moreover, defendant argues

that Dr. Fitzpatrick's new accusations made in the declaration are contradicted by her own, earlier deposition testimony, Rice's prior admissions, and the undisputed documentary evidence in the record. Defendant maintains that plaintiff is attempting, artificially, to manufacture a genuine issue of material fact and that "self-serving affidavits that lack any factual support and that contradict a party's prior deposition testimony and admissions do not create a genuine issue of material fact." Defendant asserts that this case is similar to the United States Court of Appeals for the Federal Circuit's decision in *Am–Pro Protective Agency, Inc. v. United States*.

The court agrees with the defendant. The issue on summary judgment is whether the plaintiff has submitted sufficient evidence to create a genuine issue of material fact, and whether the evidence in the record presents clear and convincing evidence that Mr. Marcos terminated the contract at issue in bad faith. Similarly, in *Am–Pro Protective Agency*, the Federal Circuit was charged with deciding

> whether Am–Pro submitted sufficient evidence to create a genuine issue of material fact about whether its inaction and its release resulted from duress by the government. In other words, we must determine if a reasonable fact finder could find, by clear and convincing evidence, that the CO [contracting officer] did not act in good faith.

*Am–Pro Protective Agency v. United States*, 281 F.3d at 1241. In the present case, the only specific allegations of discriminations stem from Dr. Fitzpatrick's affidavit, and excerpts from her deposition testimony. Similarly, in *Am–Pro Protective Agency*, the court stated: "the only evidence Am–Pro offers to support its allegations of duress, i.e., that the CO acted in bad faith, is Brown's affidavit." *Id.*

In *Am–Pro Protective Agency*, the Federal Circuit found that the affidavit submitted in the case was "insufficient to create a genuine issue of material fact." *Id.* In reaching that decision, the Federal Circuit considered "multiple factors." *Id.* First, the Federal Circuit stated that the affidavit was "utterly

uncorroborated." *Id.* (citing *Appeals of Starghill Alternative Energy Corp.*, A.S.B.C.A. No. 49612, 98–1 B.C.A. (CCH) ¶ 29,708, 1998 WL 178634 (1998) (indicating that a lack of "contemporaneous, corroborating proof" that the CO threatened to terminate a contract if the contractor refused to execute a modification supported a finding of no duress)).

In the case before this court, the allegations of gender discrimination also are uncorroborated. Plaintiff claims in its opposition that gender discrimination is evident in the difference in treatment of the females, Dr. Fitzpatrick and Dr. Fourguette, at the PDR as compared to the kick-off meeting. Plaintiff claims that the professional manner with which the females were treated at the PDR can be attributed solely to the presence of Dr. Shaw, a male. As a preliminary matter, the court notes that, assuming, for the sake of argument only, that the females of Rice were treated differently by Mr. Marcos at the PDR as compared to at the kick-off meeting, there is no evidence to suggest that the presence of Dr. Shaw, a male, at the PDR, or gender discrimination, was the reason for that variance in treatment. Plaintiff is engaging in speculation, which falls short of the clear and convincing evidence standard. Therefore, on that basis alone, plaintiff's first allegation of gender discrimination fails.

The conclusion that Dr. Fitzpatrick's allegations of gender discrimination have no substance and, therefore, no merit is made even more clear when one examines the specific instances of alleged discrimination cited by the plaintiff. In her declaration, Dr. Fitzpatrick recounts a pre-kick-off meeting telephone conference with Mr. Marcos in which he allegedly modified the sensitivity parameter on the project. As presented in her declaration, Dr. Fitzpatrick apparently views this alleged telephone conference as a ploy devised to set her up for certain failure at the kick-off meeting. In her declaration, she states: "In hindsight, I believe that Mr. Marcos' intention in switching the performance goals from 10 ng to 100 ng and then back to 10 ng was to embarrass me in front of my colleagues and to publicly call into question

my technical and managerial abilities." As defendant contends, however, even if this alleged telephone conference actually occurred, and the recollections of Dr. Fitzpatrick and Mr. Marcos as to the details of the conversation differ, plaintiff's allegation does not establish discrimination on the basis of gender. Plaintiff does not even allege discriminatory comments, behavior or correspondence on the part of government employees, only that she was embarrassed and felt her credentials were being questioned.

Moreover, Mr. Marcos testified in his deposition that he did not modify the sensitivity of the device, which is the subject of this contract, in a telephone conversation with Dr. Fitzpatrick before the kick-off meeting. Nor, for that matter, did Mr. Marcos have the authority to modify the contract orally, even if he had tried to do so. The contract at issue specifically provided that any changes to the "performance, design, configuration or other items specified in the technical proposal," including the sensitivity requirement at issue in the alleged telephone conference, would require a contract modification, with the "written approval from the Contracting Officer." As stipulated to by the parties, no contract modification was ever proposed or approved that altered the sensitivity requirements included in the original contract.

In her deposition, Dr. Fitzpatrick did not state that Mr. Marcos modified the sensitivity parameter in an attempt "to embarrass [her] in front of [her] colleagues and to publicly call into question [her] technical and

managerial abilities," as she did in her later declaration. Indeed, Dr. Fitzpatrick testified at her deposition that she was "glad" that Mr. Marcos informed Rice of the design problem at the kick-off meeting. In sum, there is no contemporaneous indication that Dr. Fitzpatrick viewed the discussions and events surrounding the technical requirements of the contract stemming from the alleged telephone conference with Mr. Marcos as evidence of gender discrimination, or bad faith. In fact, Dr. Fitzpatrick responded during her deposition:

A.... [T]he problems that were referred to in the statement were that the sensitivity wasn't there and that it was too heavy. Okay? The sensitivity was because of Frank's direction. And the heaviness also arose out of that, because that's the design we adopted, given the sensitivity....The weight was heavier than expected, but we knew that. But once, again, the kickoff meeting is the beginning of the contract....And if Frank says it's too heavy, great. I'm glad he tells us that at the kickoff meeting and not, you know, halfway down the line, when it's halfway built.[17]

Additionally, although Dr. Fitzpatrick testified that Mr. Marcos modified the sensitivity of the device before the kick-off meeting, she also testified that Rice's design changed due to Rice's discovery, shortly after the contract award, that its original design was flawed. According to Dr. Fitzpatrick's deposition testimony, as a result of problems stemming from Rice's original design, Rice shifted to a "box design," which was presented at the kick-off meeting.[18] According to

---

[17] This deposition exchange continued with the defendant asking the following question: "Q. Well, you knew before the kickoff meeting that it was too heavy, though, right? I mean, you had the weight requirement in the contract? A. Well, we—it's a best-effort basis...."

[18] In her deposition, Dr. Fitzpatrick testified:
Q. And what happens between this award in July and the kickoff that leads to the changes?
A.... [W]e looked at this original design, but we realized it had some problems with it.
Q. Who realized there were problems?
A. It was Dominique, myself. Probably both of us. And Carlos probably was there too.
&ast;&ast;&ast;&ast;&ast;&ast;
Q. Okay. So what did you do to address the keyholing problem?
A. We changed the design.

Q. Who changed the design?
A. Dominique came up with a new design.
Q. And what was that design?
A. It was a box with a proof mass inside.

&ast;&ast;&ast;&ast;&ast;&ast;
Q. So Dominique comes up with a new design. And does she pitch it at the kickoff meeting?
A. Yeah.
Dr. Fitzpatrick also testified, however, regarding the "box idea": "I think the idea itself was before, but the particulars came after Frank said 100 nano-g's."

the defendant, it is this new design, not an alleged directive from Mr. Marcos, that yielded an instrument of far less sensitivity than that required by the contract.

Dr. Fitzpatrick's allegations and testimony at her deposition are contradictory. In a November 19, 1998 letter, Rice stated that "we know what was presented at the kick-off meeting was in good faith and was the result of further Phase II mathematical modeling and materials analysis of our originally proposed POM design." Moreover, as defendant notes, the record does not indicate that plaintiff complained about the Air Force's failure to abide by Mr. Marcos' prior, alleged instruction modifying the sensitivity parameter after the kick-off meeting. To the contrary, after the kick-off meeting, in that November 19, 1998 letter, Rice described Mr. Marcos' reaction to the "disclosure of weight constraints and design deficiencies" to be "understandably one of surprise and disappointment." As defendant underscores, this language is inconsistent with plaintiff's allegation that Mr. Marcos changed the sensitivity requirement to 100 ng prior to the kick-off meeting. If Mr. Marcos directed Rice to change the sensitivity requirement to 100 ng, and plaintiff presented a design consistent with that request at the kick-off meeting, why would Mr. Marcos have reason to be "surprise[d] and disappoint[ed]"?

Finally, in an e-mail dated September 21, 1998, from Dr. Fitzpatrick to Mr. Marcos, Dr. Fitzpatrick did not reference Mr. Marcos' alleged directive modifying the sensitivity requirement, nor did she complain about Mr. Marcos' failure to comply with his own alleged instruction. Rather, Rice appeared to take responsibility for the modified sensitivity, stating: "We apologize for any confusion that may have arisen between the weight of the sensor per axis and the total weight and also any additional confusion on the desired sensitivity."

In her declaration, Dr. Fitzpatrick also alleges that at the kick-off meeting, Mr. Marcos treated her with hostility, described

as "venomous," and with "professional animosity." [19] She further claims in her declaration that Mr. Marcos tried to "publicly call into question her technical and managerial ability." The court notes, again, that even if true, Mr. Marcos' actions are not evidence of gender discrimination. Indeed, any "animosity" Mr. Marcos may have displayed at the kick-off meeting likely stemmed, not from gender discrimination, but from what Mr. Marcos considered to be Rice's poor performance and failure to conform with personnel and technical contract requirements. According to the defendant, the kick-off meeting was "a complete disaster." In his deposition, Mr. Marcos testified that "the [kick-off] meeting was amazing. The principal investigator didn't show up.... And the specifications in the contract weren't going to be met." The defendant maintains that the new design presented at the kick-off meeting "was twenty-five times less precise, and three times bigger and heavier, than the design and performance goals set forth in Rice's proposal," upon which the contract award was based. In addition, Mr. Marcos observed that Dr. Fitzpatrick "indicated no knowledge of any other company's activities in building accelerometers" and "with one chart, Dr. Fitzpatrick showed an interpretation of how the accelerometer would be used that was incorrect and not consistent with our stated SBIR objective." Similarly, the record contains no written documentation of Mr. Marcos' allegedly "venomous" or discriminatory hostility toward Dr. Fitzpatrick. To the contrary, as noted previously, after the kick-off meeting, Dr. Fitzpatrick wrote that: "Mr. Marcos' reaction to Rice Systems disclosure of weight constraints and design deficiencies was understandably one of surprise and disappointment." In sum, the court agrees with the defendant that the first accusation in Dr. Fitzpatrick's declaration of gender discrimination "amount[s] to nothing more than her opinion as to how she was treated at the kick-off meeting." Uncorroborated personal beliefs are not suffi-

---

19. Dr. Fitzpatrick failed to mention these harsh accusations regarding Mr. Marcos during her deposition. She testified as follows: "Q. Okay. Were any questions asked of you, as the president, at the kickoff? A. Not that I recall. You know, not that I recall. Not especially to me as president of the company."

cient to withstand a motion for summary judgment.

The second allegation of gender discrimination in Dr. Fitzpatrick's declaration, that she was forced to hire Dr. Shaw, a male, also is uncorroborated. In her declaration, Dr. Fitzpatrick states that she "felt" that she "was forced to hire Dr. Shaw" to maintain the contract, and that the substitution of Dr. Shaw "was just another experience that she has had with the 'good old boy club.'" As defendant notes, once again, plaintiff offers no facts in support of Dr. Fitzpatrick's "feelings" and "beliefs" in this regard.

Significantly, Dr. Fitzgerald did not state in her deposition that she was forced to hire Dr. Shaw by Mr. Marcos for the sole reason that he was a male. She testified as follows:

Q. Whose idea was it to bring in Shaw?

A. Frank Marcos.

Q. Do you think that was a good idea?

A. Yeah. I think Jerry really was—he's a very good guy.

Q. Did you need his experience?

A. I think—yeah, I think we did. I think that he was a good addition to the program.

The Principal Investigator position was described by the Air Force as "the single most important" position on the project at issue. According to the defendant, the Air Force's award of the Phase II contract to Rice was premised largely on the identification of Dr. Vali as the Principal Investigator. In a May 10, 1999 internal Air Force memorandum, Mr. Marcos stated that Dr. Vali's "qualifications were a strong factor in supporting both the Phase I and Phase II SBIR efforts." The evaluation of Rice's proposal stated that the:

Principal Investigator/key investigator, supporting staff and consultants were rated excellent. Rice systems has assembled a highly qualified team to carry out the proposed research. The Principal Investigator of the proposed research, Dr. Victor Vali, is one of the pioneers in fiber optics and integrated optics sensors, and has published over 65 papers in these fields. He has been Principal Investigator on a

number of ... other government agency contracts.

In short, according to Mr. Marcos, Dr. Vali had "dazzling credentials." The contract stated: "The Rice Systems, Inc. Principal Investigator for this effort is Dr. Victor Vali. No substitution shall be made without the prior written approval" of the Air Force.

Given these facts and circumstances, the loss of Dr. Vali was a valid concern. The government stated in a May 10, 1999 memorandum that the "new Principal Investigator's qualification should be commensurate with those originally proposed." In the May 10, 1999 memorandum, Mr. Marcos wrote that "Dr. Fitzpatrick's activities on this contract and her background were deemed not commensurate with the required qualifications needed to design and build the proposed new accelerometer." Similarly, during his deposition, when asked about the basis for his decision to reject Dr. Fitzpatrick as the Principal Investigator, Mr. Marcos stated that his decision "was based on her lack of qualifications relative to what the contract called for. It was based on the poor performance we witnessed at the kickoff meeting but certainly not gender bias." For instance, in the May 10, 1999 memorandum, Mr. Marcos stated that "Dr. Fitzpatrick's specialty in nuclear engineering and her experience with a Space Shuttle experiment are largely irrelevant to this contract." He also recounted the problems that had occurred at the August 27, 1998 kick-off meeting:

Dr. Fitzpatrick gave a very disturbing performance in relating her company's activity on this contract since its inception. Although the contract had just been signed on 10 July 98, Rice stated that they were replacing their Principal Investigator, their program manager and both subcontractors. Technically, the instrument specifications had degraded significantly from those initially proposed. We were now being offered an instrument that was twenty-five (25) times below sensitivity requirements from that proposed. In addition, the weight and size had each grown by a factor of three. In addition, Dr. Fitzpatrick indicated no knowledge of any other company's activities in building acceler-

ometers. Further, with one chart, Dr. Fitzpatrick showed an interpretation of how the accelerometer would be used that was incorrect and not consistent with our stated SBIR objective. Rice's claim that Dr. Fitzpatrick had effectively been acting as Principal Investigator for the last ten months ... indicate that she was responsible for the degradation of the instrument performance from those initially proposed.

After the kick-off meeting, on September 14, 1998, Mr. Marcos sent Dr. Fitzpatrick an e-mail outlining the government's concern regarding the Principal Investigator position. In his e-mail, Mr, Marcos stated:

The Principal Investigator [Dr. Vali] proposed was stated as being a pioneer in fiber optic and integrated optic sensors. His accomplishments included inventions, extensive experience in the field and about 65 scientific publications. The Principal Investigator [Dr. Vali] did not attend the meeting. We were told he plans to retire and will be replaced. We believe that a new Principal Investigator should possess qualifications similar to those initially proposed and contractually agreed upon.

Additionally, Mr. Marcos noted in a May 10, 1999 memorandum to the Air Force Research Laboratory that the "company has displayed a lack of candor in their Principal Investigator dealings. In 1998, Rice Systems (Dr. Fitzpatrick) made false claims about retaining the initial Principal Investigator [Dr. Vali] as a consultant and then about having other consultants support Dr. Fitzpatrick."

The claim that Dr. Fitzpatrick was forced to hire Dr. Shaw as a Co–Principal Investigator as a result of gender discrimination is not substantiated by any documents in the record. In addition to Mr. Marcos' professional concerns regarding the qualifications of the candidates proposed as Principal Investigators following Dr. Vali, plaintiff's allegations are seemingly contradicted by a December 14, 1998 letter from Rice to the contracting officer in which Rice states: "Thanks to the support and help from Mr. Frank Marcos, Rice Systems, Inc. has negotiated a formal consultant agreement for the services of Dr. Gerald L. Shaw."

Furthermore, as defendant notes, plaintiff does not explain the inconsistency of why the Air Force, after allegedly forcing Dr. Fitzpatrick to hire Dr. Shaw because he is male, would then terminate the contract after Rice had hired Dr. Shaw. Defendant argues:

Rice is claiming on the one hand that the Air Force forced Rice to hire Dr. Shaw because of sex discrimination, but then once Rice acquiesced and hired Dr. Shaw, the Air Force terminated the contract—again, because of sex discrimination. Rice simply ignores this logical fallacy at the heart of its claim. . . .

The court agrees.

Finally, even if Dr. Fitzpatrick felt that she had to hire Dr. Shaw, that fact, alone, is not necessarily evidence of gender discrimination. To the contrary, as conceded by Dr. Fitzpatrick in her deposition, cited above, Dr. Shaw substantively contributed to the project with his expertise. In another except from her deposition, Dr. Fitzpatrick stated: "But having Jerry Shaw was really, really great. He enhanced it." Indeed, even in her declaration, in which she makes the gender discrimination allegation involving the hiring of Dr. Shaw, Dr. Fitzpatrick also states that Dr. Shaw was "helpful" and was "personally qualified." In short, Dr. Fitzpatrick's second allegation of gender discrimination concerning the hiring of Dr. Shaw appearing in her belated declaration also is uncorroborated.

Moreover, plaintiff's gender discrimination claims are implausible for several additional reasons. In the first place, Mr. Marcos approved a woman, Dr. Fourgette, as Co–Principal Investigator, which undermines Rice's theory that Mr. Marcos was engaging in gender discrimination. Second, in his deposition, Rice's business manager denied that he ever heard or witnessed Mr. Marcos engage in discriminatory behavior. Third, an independent investigation by Air Force scientists, who were not affiliated with the POM project, concluded that the decision to reject Dr. Fitzpatrick as a replacement Principal Investigator for Dr. Vali was "a reasonable decision," and not the product of gender discrimination. Finally, the contracting officer, Iris Durden, was female and was the individ-

ual ultimately responsible for the decision to terminate the contract for the convenience of the government.[20] *See Am–Pro Protective Agency, Inc. v. United States*, 281 F.3d at 1242–43 (discussing the "inherent implausibility" of claimant's affidavit).

A review of Dr. Fitzpatrick's affidavit further supports a finding of no material facts in dispute in this case. In *Am–Pro Protective Agency*, the court also underscored "other factors [that] support a holding that Am–Pro has failed to create a genuine issue of material fact," *id.*, including that the affidavit was not prepared until six years after the alleged threats took place and that the involvement of counsel preceded the submission of plaintiff's affidavit.

According to the Federal Circuit:

Am–Pro's belated assertions, with no corroborating evidence, therefore falls short of the "clear and convincing" or "highly probable" (formerly described as "well-nigh irrefragable") threshold. This is especially so because nothing else in the record hints that the CO acted improperly. On the contrary, the contemporaneous documentary record suggests the CO acted in good faith and properly. . . .

Had Brown, or any other Am–Pro representative [been] present when the alleged threats took place, made a notation or some form of contemporaneous record either to Am–Pro's attorneys or simply to Am–Pro's internal files, this might be a different case. A contemporaneous record of the alleged threats would have strengthened the plausibility of Brown's allegations. But when (as here) the only evidence offered by the plaintiff is an uncorroborated and implausible affidavit prepared six years after the underlying facts occurred, and given that the documentary evidence of record . . . is contrary to this affidavit, we hold that such evidence cannot, as a matter of law, meet the clear and convincing burden of proof necessary to overcome the presumption the government official acted properly and in good faith.

*Am–Pro Protective Agency v. United States*, 281 F.3d at 1243. Similarly, in the case before this court, Dr. Fitzpatrick's declaration, which contained the specific allegations of gender discrimination in this case, was not prepared until more than five years after the alleged acts of discrimination occurred and the "involvement of counsel" also preceded the new allegations made by Dr. Fitzpatrick in her declaration.

Indeed, the record in the case before this court does not contain any contemporaneous documentary evidence to support the belated allegations in Dr. Fitzpatrick's declaration. Plaintiff merely relies on Dr. Fitzpatrick's "bald assertions and speculation of wrongful conduct" in her belated declaration to substantiate its claims that the government acted in bad faith, which, alone, are insufficient. *T & M Distribs., Inc. v. United States*, 185 F.3d at 1285 ("T & M cannot defeat summary judgment and obtain discovery with just bald assertions and speculation of wrongful conduct."); *see also Fields v. United States*, 53 Fed.Cl. at 418 ("And even if this court were to consider plaintiff's affidavit, the bland allegations of bad faith presented therein are wholly insufficient to establish bad faith.").

As the Federal Circuit stated in *Am–Pro Protective Agency*:

Ordinarily, such an affidavit would probably meet the evidentiary standard needed to avoid summary judgment. Indeed, if this were a typical summary issue, one that did not involve a strong presumption in favor of a particular party, the presence of Brown's affidavit and the CO's sworn denials would create a traditional "swearing contest" and thus be inappropriate for summary disposition. But given the clear and convincing evidence needed to show that the CO acted in bad faith, and given the six years of silence and the involvement of counsel, we hold that Brown's statement alone cannot withstand summary judgment.

*Am–Pro Protective Agency v. United States*, 281 F.3d at 1241.

---

**20.** In *Am–Pro Protective Agency*, the court found the affidavit at issue "implausible," in part, because the contracting officer lacked the authority to take the actions alleged by the plaintiff. *Id.* at

1242. Similarly, Mr. Marcos did not have the authority to modify the contract requirements, as Dr. Fitzpatrick claims he did.

In *Sinskey v. Pharmacia Ophthalmics Inc.*, the Federal Circuit also expressly rejected the notion that a party can subsequently manufacture an issue of fact, when none existed before, merely by producing a contradictory affidavit late in a litigation with the aim of precluding summary judgment. The Federal Circuit stated:

> A party cannot create an issue of fact by supplying an affidavit contradicting his prior deposition testimony, without explaining the contradiction or attempting to resolve the disparity.... Where, as here, a party has been examined extensively at deposition and then seeks to create an issue of fact through a later, inconsistent declaration, he has the duty to provide a satisfactory explanation for the discrepancy at the time the declaration is filed. To allow him to preclude summary judgment simply by contradicting his own prior statements would seriously impair the utility of Federal Rule of Civil Procedure 56.

*Sinskey v. Pharmacia Ophthalmics, Inc.*, 982 F.2d 494, 498 (Fed.Cir.1992), *cert. denied*, 508 U.S. 912, 113 S.Ct. 2346, 124 L.Ed.2d 256 (1993); *see also Fields v. United States*, 53 Fed.Cl. at 418.

In the case currently before the court, Dr. Fitzpatrick has not provided an explanation that serves to resolve the discrepancy between the allegations in her declaration and her earlier deposition testimony. She has not explained why she failed to mention the allegations of gender discrimination that appear in her declaration in her earlier deposition. In sum, this court finds that Dr. Fitzpatrick's declaration contains uncorroborated allegations, which do not amount to the clear and convincing evidence required to overcome the presumption that the government terminated the contract at issue in good faith. In fact, the plaintiff has failed to present any evidence that the defendant, in the person of Mr. Marcos, or any other government official, engaged in discriminatory conduct on the basis of gender. Therefore, Rice has failed to create a genuine factual dispute as to whether the government officials acted in a discriminatory fashion and the court, therefore, grants defendant's motion for summary judgment as to plaintiff's gender discrimination claim.

## National Origin Discrimination

■ In its complaint, plaintiff also alleges that Mr. Marcos' decision that Dr. Mohamed Abid was not qualified to serve as Principal Investigator on the project at issue "was likewise made in bad faith and was attenuated with an intent to injure." Specifically, plaintiff alleges that Mr. Marcos discriminated against Dr. Abid on the basis of his national origin. Defendant rejects plaintiff's allegation and maintains that Mr. Marcos' refusal to approve Dr. Abid as the Principal Investigator on the project at issue was made with proper justification and in good faith. Defendant further asserts that plaintiff has proffered no evidence in support of its bald allegation of national origin discrimination and, therefore, no issue for trial exists.

The court agrees with the defendant. The evidentiary record does not contain any evidence, let alone clear and convincing evidence, that Dr. Abid was rejected as the proposed Principal Investigator on the basis of his national origin. Indeed, as defendant underscores, even the target of the alleged discrimination, Dr. Abid, denied in his deposition that he was ever the victim of any discriminatory conduct, as the following excerpt demonstrates:

> Q. Did you ever have any direct interactions with anybody from the [A]ir [F]orce on the Hanscom project?
>
> A. No.
>
> Q. No? Did you ever have any direct dealings with Frank Marcos?
>
> A. No, I don't recall. Probably—conference call or something like that, you're talking about, or personal?
>
> Q. Any interaction at all.
>
> A. I'm not sure about a conference call. But personally, I didn't; never talk to him personally.
>
> Q. Okay. How about Iris Durden?
>
> A. I don't recall.
>
> Q. Do you recall anybody from the [A]ir [F]orce ever treating you on the Hanscom project in a discriminatory manner?
>
> A. I'm not sure. What is it again?

Q. Did anybody from the [A]ir [F]orce on the Hanscom project ever treat you in a discriminatory manner?

A. I don't think so.

Moreover, the Air Force's decision to reject Dr. Abid as the Principal Investigator appears to be in good faith and reasonable based on a review of Dr. Abid's credentials. In an e-mail dated March 17, 1999, from Mr. Marcos to Dr. Fitzpatrick, Mr. Marcos explained the basis for his decision that Dr. Abid was not qualified for the position of Principal Investigator on this project: "The candidate you describe [Dr. Abid] has just received a PhD in February 1999. While he seems to be a good addition to a team, he does not bring to bear the experience needed to lead this specific breakthrough study." In a March 21, 1999 e-mail to Mr. Marcos, Dr. Fitzpatrick conceded that the Air Force's assertion that Dr. Abid was a "new PhD" was "well taken," and Dr. Abid "would definitely have a learning curve on the optics part of the project." Similarly, in a letter, dated March 31, 1999, Rice also conceded that Mr. Marcos' decision regarding Mr. Abid was reasonable, stating: "Mr. Marcos raised the point that Mohamed was a new PhD and did not have the background in optics that was needed to lead this project. We though[t] that Mr. Marcos had a good point." The Air Force's conclusion that a new Ph.D. was not as qualified to serve as the Principal Investigator as Dr. Vali, who had been described as a "pioneer" for over twenty years and had amassed a great deal of experience, appears to be a reasonable one and, therefore, not in bad faith.

Indeed, in its opposition brief, plaintiff concedes that, "[w]ithout any direct contact with Mr. Marcos, it is unlikely that Dr. Abid could articulate any direct evidence of discrimination." After this concession, plaintiff states: "However, [Dr. Abid] was clear that the contractual decision was not based on science." Dr. Abid's alleged perception, as articulated by plaintiff's counsel, even if "clear," does not serve as clear and convincing evidence that the Air Force terminated Rice's contract solely on the basis of national origin discrimination. Significantly, in his deposition, Dr. Abid could not point to any instances of discrimination against him. *See Fields v. United States,* 53 Fed.Cl. at 418 (granting defendant's motion for summary judgment on plaintiff's bad faith claim, where plaintiff denied in a deposition that the government official had acted in bad faith to him).

In its opposition, plaintiff also quotes from an e-mail sent by Dr. Shaw to Dr. Fitzpatrick concerning the rejection of Dr. Abid in which Dr. Shaw stated that he was "surprised by Frank's [Mr. Marco's] response," he was "quite impressed with the resume" he received, and he "did not see why there would be any objection." Dr. Shaw's e-mail, however, does not indicate that Rice's contract was terminated on the basis of national origin discrimination, or bad faith, for that matter; at the most, it indicates a difference of opinion as to whether Dr. Abid was qualified to assume the position of Principal Investigator on the project. Differences of opinion, even if genuinely held, however, are not sufficient to establish bad faith. In the current lawsuit, the court is not charged with the task of evaluating the merits of the decision by the Air Force, nor of deciding whether an alternate course of action also could have been acceptable, or even more prudent. Rather, the court's inquiry is limited to determining whether the Air Force engaged in discriminatory conduct and terminated Rice's contract in bad faith. Due to the lack of evidence that Rice's contract was terminated on the basis of national origin discrimination or bad faith, the court grants defendant's motion for summary judgment on this charge.

**Bad Faith**

After comprehensive briefing on defendant's motion for summary judgment and oral argument on those briefs, in plaintiff's supplemental, post-oral argument brief, plaintiff states that: "The Court, although skeptical of the discrimination complaints, may yet find bad faith if Mr. Marcos acted arbitrarily, capriciously, or so grossly negligent as to amount to bad faith. This issue goes to the approval or non-approval of Dr. Fitzpatrick ...." To the extent the plaintiff is attempting, at the eleventh hour, to add yet another new argument to a weak case, the court rejects such an attempt.

In *Am–Pro Protective Agency*, the Federal Circuit noted that the government official's "course of conduct suggests she acted in good faith." *Am–Pro Protective Agency v. United States*, 281 F.3d at 1241. The Federal Circuit also stated that Am–Pro's perception of the contracting officer's explanation as a threat is "implausible; rather, the CO's statements appear to reflect normal and appropriate business concerns." *Id.* at 1242. In the present case, Mr. Marcos' course of conduct also suggests that he acted in good faith when he terminated the contract. Mr. Marcos' concerns regarding Rice's failure to find an appropriate Principal Investigator, concern, as a result, of the multiple changes in personnel, regarding the subcontractors' inability to meet contract specifications, and lack of progress on the contract reflected normal and appropriate business concerns.

Finally, the court notes that the record does not support bad faith of any variety related to the stoppage or funds allocated to the contract and the termination of Rice's relationship with the government. In an e-mail to Dr. Fitzpatrick, Mr. Marcos wrote:

The goals of this effort, consistent with your original proposal, were to develop a flight prototype sensor that significantly reduced the size, weight and cost of current satellite drag accelerometer systems while maintaining sensitivity. The major AFRL concerns are based on the significant deviations between the material presented at this meeting and that contained in your proposal.

1. The sensitivity of the experiment was originally proposed to be 4 nano-g. The goal was given as what could be practically achieved during the development phase. At the kick-off meeting the sensitivity was reduced to only 100 nano-g. We believe that the sensitivity goal of 4 nano-g should be maintained, although a threshold of 10 nano-g may be acceptable.

2. The weight of the instrument was originally proposed as 2 kg. At the Kick-off meeting the weight was given as 6 kg. This factor of 3 increase results in an instrument heavier than that currently flown.

\*　　\*　　\*　　\*　　\*　　\*

We look forward to your planned submission of a revised approach to meet the original proposal goals.

Indeed, as noted, Rice acknowledged that "Mr. Marcos's reaction to Rice Systems disclosure of weight constraints and design deficiencies was understandably one of surprise and disappointment."

In a letter to the contracting officer, dated September 28, 1998, Rice stated: … Rice Systems is not requesting a change to the technical goals of our original proposal; however as an R & D contractor, we realize it is incumbent on us to keep the technical monitor aware of technical developments. At our kick-off meeting, we discussed problems with the proposed design of the microaccelerometer and presented our latest efforts towards improvement. To date, we have made significant progress in weight and materials management. We feel that the proper forum for official technical disclosure and/or technical change is the Preliminary Design Review (PDR) at which time we hope all contractual issues will be resolved.

However, in his May 10, 1999 memorandum, Mr. Marcos noted that, at the time of the Preliminary Design Review, held on February 22, 1999, problems still remained. Mr. Marcos wrote:

Rice proposed their third major design change since contract award. However, the sensitivity was still a factor of 2.5 off from that proposed; the size was more than a factor of three from that proposed and the weight was still 65% higher than that proposed. We requested mathematical substantiation for some of the claims for this newest design. As of the time our descoping letter, more than two months later, we had still not received this information. This has served to further confirm our lack of confidence in her [Dr. Fitzpatrick's] capability to act as Principal Investigator since she had lost a key technical person, Dr. Dominique Fourquette, just after the PDR.

Mr. Marcos concluded his May 10, 1999 memorandum by stating:

We continued to maintain, as Rice inferred in their Phase I and II proposals, that technical expertise consistent with the ORIGINAL Principal Investigator's qualifications are needed to maximize the chance of obtaining a successful result. The deficiencies in their replacements and their apparent unwillingness to successfully attract the required expertise has *jeopardized* the SBIR effort. **Given our inability to reach a satisfactory conclusion with Rice Systems regarding a new Principal Investigator, we felt it was in the best interest of the government to terminate the effort.**

(emphasis in original). In sum, the record indicates that, in light of Rice's performance, Mr. Marcos had normal and appropriate business concerns, and was acting in good faith. *See Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d at 1242.

Moreover, the record does not indicate that Mr. Marcos and the Air Force were unreasonable in their dealings with Rice; to the contrary, Mr. Marcos appeared to be trying to assist Rice to achieve the contract goals. For instance, Mr. Marcos assisted Rice in identifying a Co–Principal Investigator for which Rice expressed its gratitude: "Thanks to the support and help from Mr. Frank Marcos, Rice Systems, Inc. has negotiated a formal consultant agreement for the services of Dr. Gerald L. Shaw." In addition, in a March 2, 1999 letter to the Air Force, Rice described Mr. Marcos as understanding and supportive upon learning of Dr. Fourguette's resignation. Rice's letter stated: "The call was placed to Mr. Marcos on Monday the 1st. As expected, he was as shocked as we were when hearing the news. Mr. Marcos stated that he understood the dilemma and promised to support the program in any way he could."

Furthermore, the record indicates that the Air Force gave Rice ample time to find a suitable candidate for the Principal Investigator position, but none was found. Rice was also given more than nine months, during which time Dr. Fitzpatrick was effectively acting as Principal Investigator, to meet the design specifications set forth in the contract, or to make any progress toward meeting those specifications, and it failed. The record does not indicate that, in terminating Rice's contract, Mr. Marcos had a " 'specific intent to injure' " Dr. Fitzpatrick, or that he treated her unfairly. *Galen Med. Assocs., Inc. v. United States,* 369 F.3d at 1330 (" 'In the cases where the court has considered allegations of bad faith, the necessary 'irrefragable proof' has been equated with evidence of some specific intent to injure the plaintiff.' ") (quoting *Torncello v. United States,* 681 F.2d at 770). Plaintiff has not proven that the termination of the contract in this case was motivated by malice was part of a proven "conspiracy to get rid of Dr. Fitzpatrick," nor does the record suggest that the termination of Rice's contract was part of a course of governmental conduct which was oppressive by design or actuated by animus toward Dr. Fitzpatrick.

Based on an extensive review of the record in this case of gender or national origin discrimination, the court has not found evidence that Mr. Marcos acted arbitrarily, capriciously, or in a grossly negligent manner in his dealings with the plaintiff during the course of performance of the contract with Rice.

### CONCLUSION

Plaintiff has failed to meet its evidentiary burden in this case. Plaintiff has not offered clear and convincing evidence sufficient to overcome the presumption that the government officials acted in good faith, to create a genuine, material factual dispute as to whether gender or national origin discrimination occurred or that the contract was terminated in bad faith. As a result, the court **GRANTS** defendant's motion for summary judgment. The clerk of the court shall **DISMISS** the plaintiff's complaint, with prejudice, and enter **JUDGMENT** for the defendant consistent with this opinion.

**IT IS SO ORDERED.**